# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 6, 2015

## STATE OF TENNESSEE v. JOHN D. BAILEY

**Appeal from the Circuit Court for Dyer County**
**No. 11-CR-398     Russell Lee Moore, Jr., Judge**

---

### No. W2014-00705-CCA-R3-CD  - Filed March 27, 2015

---

Appellant, John D. Bailey, was convicted by a jury of first degree premeditated murder and sentenced to life imprisonment. On appeal, he argues that the trial court erred by failing to suppress his statement to the police and that the evidence was insufficient to support his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

James E. Lanier, District Public Defender (at trial and on appeal); and Sean Patrick Day, Assistant District Public Defender (on appeal), Dyersburg, Tennessee, for the appellant, John D. Bailey.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case concerns the shooting death of Helen Robertson in Newbern, Tennessee, on August 31, 2011. Appellant was the roommate of Tracy Byrd,[1] who had an ongoing dispute with Ms. Robertson concerning the care of K.H.,[2] Ms. Robertson's daughter and Ms. Byrd's stepdaughter. Appellant made an inculpatory statement to the police, which he subsequently moved to suppress. The trial court held a suppression hearing and thereafter

---

[1] The record often refers to Ms. Byrd as Tracy Ham, a former married name.

[2] It is the policy of this court to protect the identity of minors.

denied appellant's motion to suppress. The case proceeded to trial, where the jury found appellant guilty of premeditated first degree murder.

## I. Facts

### A. Suppression Hearing

Tracy Byrd testified that on September 1, 2011, she went to Northview Middle School to pick up two children for orthodontist appointments. While at the school, the principal told her about Ms. Robertson's death and asked Ms. Byrd to stay at the school to talk to the police. The police talked to her for a few minutes and then asked her to go to the police department for questioning. She agreed to go and drove her own vehicle to the police department. Ms. Byrd testified that the police asked her about her whereabouts the previous day and whether she could prove where she was at any point. She gave her consent for Investigator Greg Barr to retrieve Walmart receipts from her vehicle, which showed that she was at the Dyersburg Walmart the night before. Ms. Byrd said that the police asked for her consent to search her house, which she gave. She stated that the police told her that she "had to go straight back to [her] house" and that she could not first pick up her children from school. She said that she went to her house and that the police were already there.

Ms. Byrd testified that she assumed appellant was in the house at that time but that she did not see him. She further testified that when she asked the police again about picking up her children, she was told that she could not leave and that she could not use the telephone to call a friend to pick up the children. Investigator Rodney Wright then told her that she had to go back to the police station with him, and he had her sit in the front seat of his vehicle on the way to the station. Ms. Byrd testified that she asked whether she could drive her own vehicle but was told that she could not. She said that she was placed in a room at the police department and, soon after arriving, was shackled to a chair. She stated that they moved her to different rooms over the course of the evening but would re-shackle her after each move.

Ms. Byrd testified that the police finally interviewed her "around three in the morning," when she had "been there all day and most of the night with nothing to eat and nothing to drink." She said that she did not leave the police department until after 6:00 a.m. on September 2. Ms. Byrd stated that while she was at the police department, she occasionally saw glimpses of appellant, who was "handcuffed and shackled the same way that [she] was." She further stated that Investigator Wright told her that "he would have Child Services come pick [her] kids up if [she] didn't tell them what they wanted [her] to tell them." She testified that he convinced her to talk to appellant by telling her that the only way that she would see her children again was to "tell [appellant] to tell [the police] what they wanted to hear." She said that Investigator Wright led her to an office where appellant was sitting and that she told appellant, "'John, please tell them whatever they want to know, what

they want to hear, because he said I can't go home to my babies if you don't.'" Ms. Byrd also said that Investigator Wright told her that she would get a lethal injection "if [she] didn't watch what [she] was doing."

On cross-examination, Ms. Byrd testified that K.H. was her ex-husband's daughter and that the victim was K.H.'s mother. However, K.H. actually lived with Ms. Byrd, despite the fact that she was no longer married to K.H.'s father. Ms. Byrd agreed that she had an ongoing dispute with the victim about the victim's treatment of K.H. She further agreed that appellant, who had been her roommate, was aware of the disagreement. Ms. Byrd testified that she went to the school to pick up her children for orthodontist appointments but that she had to leave them at the school. She said that she was also responsible for picking up her nephew from the high school in the afternoon on a daily basis. Ms. Byrd agreed that she signed the consent to search her house at 3:00 p.m. on September 1. She said that she then went straight to her house because the police told her not to pick up her children and nephew from school. Ms. Byrd testified that a police officer picked up her eldest daughter from school and that her eldest daughter used Ms. Byrd's vehicle to pick up the younger daughters. She said that she would be surprised to learn that the recording of her statement to police began at 8:45 p.m. and ended at 9:32 p.m. She claimed that she was unaware of the passage of time because of her fear.

Newbern Police Investigator Greg Barr testified that Tracy Byrd was the first suspect with whom he made contact in the investigation of the victim's murder. He described Ms. Byrd as "very cooperative." He said that he was able to "[r]ule[] her out as the actual trigger person" quickly because she was able to prove she was at Walmart around the time of the shooting. Investigator Barr testified that Ms. Byrd signed consent forms for the police to search both her vehicle and her home. When the police arrived at her house, appellant met them at the door. Investigator Barr stated, "[Appellant] also agreed that he had no problem with us coming in and he actually accompanied us in the house and was even helping us tell which . . . room was what as we started to look in the house." Investigator Barr testified that they found Remington-Peters twelve-gauge shotgun shells in Ms. Byrd's dresser that "appeared to be very consistent" with the shell found in the murder weapon. Both the shell in the murder weapon and those found in Ms. Byrd's dresser were Remington-Peters, with green plastic and gold brass. Investigator Barr acknowledged that the shell from the murder weapon was loaded with double-aught buckshot, however, while those found in Ms. Byrd's dresser were number four shot. He stated that they did not know the shell from the murder weapon was double-aught buckshot until after they discovered the shells at Ms. Byrd's house.

Investigator Barr testified that he asked appellant whether "he would consent to come up to the police department to talk to us." He further stated that he explained to appellant that he was not under arrest. Investigator Barr said that appellant agreed to go to the police

station and also agreed to ride with Officer Robert Harrison to the station. Investigator Barr acknowledged that appellant consented to go to the police station at 3:40 p.m. and that the police did not begin interviewing him until 10:39 p.m. He explained that appellant was in a courtroom adjacent to the police department during those seven hours. Appellant was alone for much of the time. Investigator Barr testified that appellant was not handcuffed or shackled during those seven hours. He said that he made clear to appellant that he was not under arrest. Investigator Barr said that the courtroom had an unlocked door to the outside and that "[a]ll he had to do is leave." Investigator Barr testified that appellant was not detained until immediately after Ms. Byrd finished her recorded statement, which was at 9:32 p.m. He explained that he and his partner had an unrecorded interview with Ms. Byrd from 5:44 p.m. until 7:43 p.m., when they took a short break, and then they recorded Ms. Byrd's statement from 8:45 p.m. to 9:32 p.m. Both Ms. Byrd and appellant were detained after Ms. Byrd's statement. Investigator Barr testified that they began interviewing appellant at 10:39 p.m. He said that appellant denied any involvement in the victim's murder until the police brought Ms. Byrd into the room. Investigator Barr testified that Ms. Byrd told appellant, "'John, tell them the truth. I've already told them what you did to Helen.'" Following that confrontation, appellant "began to tell [the police] in detail what he had done." He said that Ms. Byrd was not restrained when they brought her into the room. He could not recall her saying anything to appellant about losing her children. Investigator Barr testified that Investigator Wright told Ms. Byrd that if she did not have anything to do with Ms. Robertson's death, then she should continue telling them about what appellant had done because she would not be with her children if she were in jail on a homicide charge. He further testified that Ms. Byrd's allegations that she was threatened with a lethal injection were "completely false."

On cross-examination, Investigator Barr testified that the homicide report was called in at 10:46 p.m. on August 31. To his knowledge, no news reports were available about the homicide on September 1. Investigator Barr recalled that after Ms. Byrd gave her consent for the police to search her house, she told them that she was going to pick up her children and take them to her brother's house before she returned home. He said that they began searching her house at 3:11 p.m. They transported appellant to the police department at 3:40 p.m., and Ms. Byrd returned home shortly thereafter. Investigator Barr said that Ms. Byrd wanted to leave her vehicle at her house for her eldest daughter. He stated that Investigator Wright transported Ms. Byrd to the police station, and they settled her into the intoximeter room. She was not restrained in any manner. They later interviewed her in Investigator Barr's office. She signed the *Miranda* rights waiver at 5:44 p.m. They took a break from 7:43 p.m. to 8:45 p.m. and then recorded her statement from 8:45 p.m. to 9:32 p.m. Investigator Barr testified that Ms. Byrd told them that appellant "had taken care of Helen." He agreed that Ms. Byrd gave them details of the crime that were not common knowledge, such as the fact that the victim was in front of her living room window and that the murder weapon had misfired. After her statement, both Ms. Byrd and appellant were detained.

-4-

Appellant gave his recorded statement from 3:13 a.m. to 3:49 a.m. on September 2, and Ms. Byrd was transported home at 4:31 a.m. Both Ms. Byrd's and appellant's statements were admitted into evidence as exhibits to the hearing.

William Keith Ozment, formerly a sergeant with the Newbern Police Department, testified that on September 1, he saw appellant in the courtroom adjacent to the police department. Mr. Ozment said that he "talked small talk" with appellant and that appellant was not restrained at the time. The conversation lasted fifteen to twenty minutes. That evening, the investigators asked Mr. Ozment to restrain appellant. He did not know what time exactly but thought it was between 7:30 and 9:00 p.m. Mr. Ozment said that there was a door in the courtroom that opened on to Main Street and that the door was always unlocked from the inside. Mr. Ozment testified that he did not see Chief Dunivant at the police department that day and that neither Chief Dunivant nor Chief Barnes asked him to restrain appellant.

Newbern Police Officer Robert Harrison testified that at the time of the victim's murder, he worked for the West Tennessee Violent Crime and Drug Task Force. Investigator Barr asked him to come to the scene of the victim's murder to assist in the investigation. He said that he transported appellant to the police department and that appellant was unrestrained and sat in the front seat. Officer Harrison stated that he took appellant to the courtroom and sat with him for awhile. Officer Harrison played music on his telephone, and appellant made comments about the music Officer Harrison played and about his health. Officer Harrison left after receiving a work-related call. He let Investigator Wright know where appellant was.

Newbern Police Investigator Rodney Wright testified that a twelve-gauge shotgun was located at the murder scene. He opened the action enough to see that the shell inside was a Remington-Peters shell and that it was green plastic with "high brass." He did not notice that it was double-aught buckshot until a couple of days later. Investigator Wright testified that the shells found at Ms. Byrd's home were also green plastic, high brass, Remington-Peters, but those were filled with number four shot. Investigator Wright said that appellant was not developed as a suspect until Ms. Byrd gave her statement. He further stated that no one was assigned to guard appellant while he was in the courtroom. Investigator Wright testified that he told Ms. Byrd, in response to her saying that she wanted to go home to her children, that she should tell the truth if she wanted to see her children.

On cross-examination, Investigator Wright testified that Ms. Byrd drove her own vehicle to her house after she consented for the police to search the house. He recalled that she first went to pick up children from school and took them to her brother's house. Later, she wanted to leave her vehicle at the house for her eldest daughter to use, which was why she rode with Investigator Wright to the police department.

Appellant testified that he did not feel that he had a choice about whether to go to the police department on September 1. He stated that approximately thirty minutes after he arrived, Sergeant Ozment placed leg shackles on him, saying that the Chief had ordered him to restrain appellant. Appellant said that he was restrained the entire time prior to his interview and that he was not given food during that time. When he was moved to the investigator's office, Investigator Wright offered him a snack. Appellant said that he asked for a Coke because he was "hypoglycemic or anemic" and would have needed more food than just a snack. Appellant recalled that the only time that he saw Ms. Byrd while at the police department was when the police brought her to the office. She was "leg ironed" and told him, "'Please don't take my babies away from me.'" Appellant testified that at that point, he decided to "tell them what they wanted to hear," even though neither he nor Ms. Byrd had anything to do with the murder. Appellant also testified that he had not eaten in more than twelve hours and that he was not able to read his *Miranda* warning because he needed glasses to read.

The trial court took the matter under advisement and subsequently filed a written order denying appellant's motion to suppress his statement to the police. In its order, the trial court specifically found that the police officers' testimonies were credible and that appellant's and Ms. Byrd's testimonies were not. The trial court also found that appellant was not arrested until after Ms. Byrd's statement was completed and that there was probable cause to arrest him at that point.

## B. Trial

The State's first witness at trial was Thomas Weakley. Mr. Weakley testified that he represented the victim in a custody dispute concerning K.H. He explained that K.H. was the victim's daughter but that K.H.'s father, Jeremy Ham, had custody of K.H. The victim had visitation rights every other weekend. However, K.H. actually lived with Tracy Byrd, who was Mr. Ham's ex-wife. Ms. Byrd had moved to intervene in the custody dispute and sought to have custody of K.H. Mr. Weakley testified that the victim "vehemently objected" to Ms. Byrd's having custody of K.H.

On cross-examination, Mr. Weakley testified that there had been allegations that the victim abused K.H. However, the Department of Children's Services investigated and "made no finding that anything had happened."

William Keith Ozment testified that at the time of trial, he was the Chief of Police in the town of Obion. At the time of the victim's murder, he was an officer with the Newbern Police Department. Chief Ozment testified that he was dispatched to Ms. Robertson's house on Patty Drive in Newbern at 10:46 p.m. on August 31, 2011. He said that as he walked toward the house, he observed a shotgun lying in the front yard. When he entered through

the front door, he saw brain matter on the floor, walls, and ceiling. The victim was lying to the left of the door, face down in a pool of blood. Chief Ozment explained that the houses on Patty Drive were close together and that Highway 211 ran behind the victim's house. It was dark at the time of the shooting, however, and the street lights on Patty Drive were farther down the road. He testified that no one reported seeing anyone suspicious in connection with the murder.

On cross-examination, Chief Ozment testified that he encountered appellant on September 1 in the courtroom adjacent to the police department. He said that he assumed that the investigators had placed appellant in the courtroom to wait while they interviewed another suspect. Chief Ozment stated that he did not "feel the need" to tell appellant that he was free to go at any time because appellant was not restrained in any manner and was in a room with an unlocked exterior door.

Investigator Rodney Wright testified that he arrived at the crime scene at 11:00 p.m. on August 31, 2011. He said that based on his observations, he believed that the shooter was outside of the victim's house and fired through the living room window. The shot went through the blinds on the other side of the window and struck the victim in the head. Investigator Wright found gunpowder burns on the window, leading him to believe that the gun was fired very close to the window. He further believed that the victim had been sitting at a computer desk in front of the window, with her back to the window, when she was shot. He explained that the entry wound was on the back of her head.

Investigator Wright testified that the murder weapon was a single-shot, break action, twelve-gauge shotgun. He opened the action and prevented the gun from ejecting the shell inside. Investigator Wright said that the primer had been struck on the shell. He described the shell as having green plastic and "an extremely long piece of brass," called "high brass," which was uncommon in modern shells. The shell was a Remington-Peters Magnum double-aught buckshot. He explained that a shell loaded with double-aught buckshot contains nine pellets that are "the size of the end of [his] pinky."

Investigator Wright further testified that the police were aware of the ongoing custody dispute concerning K.H. and that he developed Tracy Byrd as a suspect due to that dispute. He said that on September 1, he contacted K.H.'s school to determine whether K.H. was present and whether she knew that her mother had been killed. The principal told him that K.H. was at school and did not appear to know about her mother. The principal called him later to inform him that Ms. Byrd was at the school to pick up K.H. and one of her daughters. Investigator Wright and Investigator Greg Barr went to the school to talk to Ms. Byrd. Ms. Byrd told the investigators that she had not known about the victim's death until the school principal told her. The investigators interviewed Ms. Byrd and found that she had an alibi

for the time of the murder — she had been at the Dyersburg Walmart and had receipts as proof.

Investigator Wright testified that Ms. Byrd gave her consent for the police to search both her vehicle and her house. When they arrived at her house, appellant answered the door. Investigator Wright said that they asked him whether he "ha[d] a problem" with the police searching the residence. He indicated that he did not, and he helped the police by pointing out which rooms belonged to whom. Investigator Wright said that they found Remington-Peters shotgun shells in appellant's dresser that appeared to be consistent with the shell he had found in the murder weapon. However, the shells from the house were number four shot. He said that he did not know at the time he searched the house that the shell from the murder weapon was double-aught buckshot.

Investigator Wright said that the police asked both Ms. Byrd and appellant to come to the police station to discuss the case. They both agreed and were transported to the police station. Ms. Byrd indicated in her interview that she had knowledge of the victim's murder. Thereafter, she and appellant were both detained. Investigator Wright testified that they subsequently interviewed appellant. He initially denied any involvement, but after Ms. Byrd spoke with him, he confessed to killing the victim. A recording of appellant's admission was played for the jury.[3] Appellant told Investigators Wright and Barr that he "had to end Helen" so that K.H. could "start to heal." He said that he went to the victim's house with a single-shot shotgun and had shells loaded with double-aught buckshot. He walked to the victim's house, avoiding roads so that he would not be seen with the shotgun. Appellant said that he made sure the victim was sitting at her computer in the living room then loaded his shotgun. He further said, "And before I pull[ed] the trigger, I said, '[K.H.],' and the gun did not work." He said that the hammer fell but the shell did not detonate. He reloaded under a tree, returned to the window, and "said the same thing about [K.H.]." He pulled the trigger, and the gun fired. When asked whether he confirmed that he had shot the victim, appellant replied that he "felt it in [his] heart." Appellant said that he left the weapon at the scene because it had no value to him and "[p]lus to give the police something they could actually work with[.]" He told the investigators that they would not find DNA because he wore long sleeves and long gloves. He later burned the clothing he wore in a bucket. He had also hidden a shotgun shell at a golf course and gave the investigators detailed directions to find the shell, along with a map.

---

[3] The compact disc containing the recording of appellant's statement is not included in the appellate record. Indeed, none of the trial exhibits have been included in the appellate record. However, a transcript of appellant's statement was made an exhibit to the suppression hearing. It is from this transcript that we have gleaned the substance of appellant's admission.

On cross-examination, Investigator Wright agreed that the police report indicated that the number four shot shotgun shells were found in Ms. Byrd's bedroom, not appellant's. He explained that appellant's personal items were in the drawer. Investigator Wright recalled that while appellant was at the police station, he offered to get appellant something to eat, but appellant only wanted a soft drink. He further recalled that Ms. Byrd's speaking to appellant was the turning point in his interview with appellant. He said that Ms. Byrd told appellant to tell the police the truth and that she had already told the police what he had told her. When asked whether Ms. Byrd included "so I don't go to jail and lose my kids," Investigator Wright said, "Well, she probably did tell him that because she was surely afraid of being arrested and charged with this murder because she had . . . told things about the crime scene."

On re-direct examination, Investigator Wright testified that the police report indicated that appellant claimed possession of the number four shot shotgun shells found in Ms. Byrd's bedroom.

Investigator Greg Barr testified that after interviewing appellant, he followed the map that appellant drew to find the shotgun shell that appellant discarded. Investigator Barr said that he successfully found the shell and that it was a Remington-Peters twelve-gauge shell with green plastic and gold brass.

Tennessee Bureau of Investigation ("TBI") Special Agent Alex Brodhag testified that he examined the murder weapon in this case. He test-fired the shotgun eight times, but the gun only successfully fired three of those times. He stated that he compared the fired twelve-gauge shell that he received from the police with the fired shells from the test-firing process and was able to determine that the fired twelve-gauge shell had been fired in the murder weapon. Agent Brodhag testified that he also received an unfired shotgun shell from the police that had a firing pin impression on it. He determined that the firing pin impression on the unfired shotgun shell was created by the murder weapon.

Dr. Karen Elizabeth Chancellor testified that she performed an autopsy on the victim's body on September 2, 2011. Dr. Chancellor found that the victim suffered a shotgun wound the right side of her head, in the temple area. Dr. Chancellor testified:

> [The wound] was a roughly round defect but because of the energy dissipated by the shotgun wound blast in the head, it had resulted in major destruction wounds radiating from this entrance defect. Fractures of all facial bones, fractures of the cranial vault. It had resulted in avulsion or removal of all of the brain tissue in her head.

Dr. Chancellor further stated that her office did not receive all of the victim's brain tissue because "part of the brain was probably on the walls of the building where she was." She agreed that the "force of the shot caused the brain to be completely removed from the skull." Dr. Chancellor testified that the victim could not have survived the wound. The State rested its case following Dr. Chancellor's testimony.

Appellant testified on his own behalf. He stated that he was a disabled Army veteran and had served in combat in Operation Desert Shield and Desert Storm. Appellant said that he lived with Tracy Byrd and that K.H. also lived with them. He testified that he observed that K.H. was "terrified and scared" of the victim, her biological mother, and that he had seen K.H. with bruises and knocked out teeth after visiting her mother.

Appellant testified that he did not kill the victim. He said that the police pressured him and told him details about the crime. He also said that they told him that either he or Ms. Byrd would be arrested for murder. While he knew that Ms. Byrd had nothing to do with the murder, he considered the fact that she was a mother and was responsible for her daughters. Appellant stated that he "happened to see this crime happen at a distance," which is why certain details were included in his statement. Appellant said that Investigator Barr began threatening him with lethal injection while the police were searching Ms. Byrd's house. He testified that the police did not give him a choice about coming to the police station. Appellant stated that he was shackled to a table the entire time that he was waiting to be interviewed. He further stated that he was never offered food and that he was only able to drink water from the faucet when he went to the restroom. He said that he was not thinking clearly when he gave his statement because he was hypoglycemic and had not eaten for over twelve hours. He testified that he changed his mind about denying involvement when the police brought Ms. Byrd into the office where he was being interviewed. He said that she was crying and was handcuffed and in leg irons. He recalled her saying, "'Please don't take my babies away from me.'" Appellant clarified that he could not remember her exact words. He said that he decided that he would give a story to the police that they would believe so that they would "back off" Ms. Byrd.

Appellant testified that he was walking down the victim's street on the night of her murder and saw someone in her yard. He saw the person trying to fire the shotgun, although he was at such a distance that he did not realize what they were doing. He saw the person walk away and stand under a tree and then return to the yard. The person then fired the shotgun. Appellant testified that after he witnessed the shooting, he walked back to his truck and drove home. He subsequently decided to go for a walk at the golf course. As he was resting from his walk under a tree, he heard someone running nearby. He saw the person pause and then run away. Appellant said that although he could not say whether it was the same person he had earlier seen in the victim's yard, it resembled that person. Both were tall

-10-

and slender and wore dark clothing. Appellant testified that he walked over to the area where the person had paused and found a shotgun shell on the ground.

Appellant testified about specific items in his statement that were untruthful. He said that while in the statement he claimed that the shotgun had no value, he would never actually own a gun that was not valuable. He also told the police that he knew a shortcut from Ms. Byrd's house to the victim's house but that there were no such shortcuts in reality because the victim's house was on a highway. Appellant testified that he was unable to tell the police what time something occurred because he did not do that thing. He explained that he always knew what time it was because of his military training. Appellant said that he knew about the victim being at her computer because she was always at her computer at night. He also said that it would have been impossible for him to see her eyes through the closed blinds, like he had claimed to have done in his statement. He stated that he told the police about saying K.H.'s name before firing the gun because that is what he would have done had he actually committed the crime. He also said that he would never have left a gun lying in a yard because he was "very safety conscious." Appellant testified that if he had actually burned clothing in a bucket as he told the police, the police would have seen the fire. He also stated that anyone needed a burn permit to have a fire in the city limits.

On cross-examination, appellant agreed that he saw someone fire a shot through the window of the victim's house but that he never told the police about that incident. He said that they would not have believed him. Appellant stated that the police gave him details about the crime, including that the ammunition used was double-aught buckshot.

In rebuttal, the State called Investigator Greg Barr. Investigator Barr testified that he and the district attorney general had gone at night to the golf course where the misfired shotgun shell had been left. He said that there was no lighting in the area. When the general stayed where the shell was found and Investigator Barr stepped away to the cart path, Investigator Barr said that he was unable to see what the general was doing.

Following the close of proof and deliberations, the jury convicted appellant as charged, and he was sentenced to life imprisonment. This appeal follows.

## II. Analysis

### A. Motion to Suppress

Appellant argues that the trial court erred by denying his motion to suppress his statement to the police and any evidence collected as a result of that statement. In support of his argument, appellant contends that he was arrested without probable cause and that his statement was coerced. The State responds that appellant was not arrested until after Ms.

-11-

Byrd gave a statement to the police implicating him, at which time there existed probable cause, and that no coercive tactics were used. We agree with the State.

In reviewing the trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

1. Probable Cause to Arrest

We begin with the proposition that "[b]oth the state and federal constitutions protect against unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression." *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Our supreme court has recognized three categories of police interactions with private citizens: "(1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification." *Id.* (citing *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000)). "'While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not.'" *Id.* (quoting *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006)).

"Under the Tennessee Constitution, a seizure implicating constitutional protections occurs only if, in view of all of the circumstances surrounding the encounter, a reasonable person would have believed that he or she was not free to leave." *Nicholson*, 188 S.W.3d at 657 (citing *Daniel*, 12 S.W.3d at 425). This is an objective, totality of the circumstances standard that "does not vary depending upon the subjective state of mind of the particular citizen being approached." *Daniel*, 12 S.W.3d at 425. Circumstances that the court should consider under this analysis include

the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

*Id.* at 426.

In this case, the police officers involved testified that appellant was not a suspect when they initially encountered him at Tracy Byrd's home. They portrayed him as cooperative and stated that he consented to go with them to the police department. Investigator Barr, in particular, testified that he explained to appellant that he was not under arrest. The police officers testified that appellant waited, unrestrained, in a room that had an unlocked exterior door. Appellant, however, testified that he was forced to go to the police department and that he was shackled the entire time he waited to be interviewed. The trial court explicitly found that the police officers were credible. Thus, the circumstances of appellant's encounter with police were that he consented to go to the police department, that he was told he was not under arrest, and that he was unrestrained prior to the conclusion of Tracy Byrd's statement implicating him in the victim's murder. Under these circumstances, we conclude that a reasonable person would have felt free to leave until appellant's detention at or around 9:32 p.m., when Ms. Byrd's statement ended and an officer restrained appellant. While not presented as an issue in this appeal, we note that the police had probable cause to arrest appellant at that point.

## 2. Voluntary Confession

Appellant claims that his statement to the police was the result of coercion because the police threatened Ms. Byrd with lethal injection and with taking her children away from her. The State responds that the trial court determined, based on witness credibility, that no such threats were made to Ms. Byrd and that therefore appellant's statement could not have been coerced. We agree with the State.

"The Fifth Amendment to the United States Constitution provides in part that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005) (quoting U.S. Const. amend. V). "Similarly, Article I, section 9 of the Tennessee Constitution states that 'in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.'" *Id.* (quoting Tenn. Const. art. I, § 9). "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citations omitted). In our state, courts consider the totality of the circumstances to

determine the voluntariness of a confession. *Id.* "[I]n order for a confession to be admissible, it must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Id.* (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). Our supreme court has also adopted the federal due process standard for voluntariness: "'whether the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined — a question to be answered with complete disregard of whether or not the petitioner in fact spoke the truth.'" *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)).

In this case, appellant maintains that he was coerced into confessing because the police threatened Ms. Byrd with the death penalty and/or losing custody of her children and then used Ms. Byrd to extract appellant's confession. In support of his argument, he cites *U.S. v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993), in which the Sixth Circuit held that "threats to arrest members of a suspect's family may cause a confession to be involuntary." However, the trial court in this case made a factual determination that the police did not threaten Ms. Byrd in any manner. Thus, in the absence of any threats, appellant's argument cannot stand.

## B. Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to support his conviction for premeditated first degree murder. He contends that no evidence showed that he was "free from . . . excitement and passion" and that no physical evidence connected him to the crime.

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010));

*State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury convicted appellant of premeditated murder. Tennessee Code Annotated section 39-13-202(a) defines this category of first degree murder as "[a] premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(d). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

A defendant's "state of mind is crucial to the establishment of the elements of the offense"; thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors support the existence of premeditation including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a

weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)).

Viewed in the light most favorable to the State, the evidence at trial showed that appellant believed the victim was abusing K.H., her daughter. Appellant went to the victim's house, knowing that she would be sitting in front of her living room window, and attempted to shoot her through the window using double-aught buckshot. His weapon misfired at least once. He reloaded and then shot the victim. The force of the gunshot essentially exploded the victim's head. He then left the shotgun in the victim's front yard and hid the unexploded shot shell on the golf course. Appellant confessed his actions to the police, and he drew a map to where he had hidden the shot shell. He also told the police that he wore gloves and long sleeves. The jury, by its verdict, chose not to believe appellant's testimony and his attempts to explain away his confession. Appellant used a deadly weapon on an unarmed victim, and he made preparations before the killing to conceal his crime by choosing to wear gloves and long sleeves. He also concealed his crime by walking to the victim's house through fields so that no one would see him carrying a shotgun. In addition, during his statement to the police, he did not give any immediately precipitating event that might have moved him to a state of passion or rendered him incapable of premeditation, *i.e.* he did not indicate that K.H. had just come home from the victim's with new injuries, for example. Therefore, we conclude that the evidence was sufficient to support appellant's conviction for premeditated first degree murder.

## CONCLUSION

Based on the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE